UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT G. ALAMO, | ) |
| Plaintiff, | ) Case No. 12-cv-4327 |
| v. | ) Judge Sharon Johnson Coleman |
| THE CITY OF CHICAGO, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Robert G. Alamo brought this employment discrimination lawsuit against his former employer, the City of Chicago, and his former supervisor, Lieutenant Charlie Bliss, based on his national origin, race, and disabilities under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Illinois Human Rights Act ("IHRA"), 735 ILCS 5/1-101, *et seq*. Before the Court is defendants' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a). For the reasons explained below, the Court grants in part and denies in part defendants' summary judgment motion. The remaining claim in this lawsuit is Alamo's hostile work environment claim based on his race and national origin. The Court dismisses plaintiff's other claims and Charlie Bliss as a named defendant from this lawsuit.

**Background**

Alamo, who is Latino and was born in Puerto Rico, began working for the Chicago Fire Department ("CFD") in February 2006, six months after he returned home from active combat duty in Afghanistan. Between October 2009 and March 2012, Alamo was assigned to Engine 55. Alamo testified at his deposition that shortly after he began working at Engine 55, a co-worker called him racially-charged names like "fucking Puerto Rican" and "spic" on an almost daily basis. Alamo

further testified that while working at Engine 55, co-workers tampered with his personal property and threw away his food. He also testified that he was temporarily assigned to other fire stations more than his co-workers. At his deposition, Alamo stated that he reported this misconduct to his supervisor Lieutenant Charlie Bliss.

On September 13, 2011, Alamo reported for duty at Engine 55. He was not feeling well, so he decided to go to the bunkroom to lie down, at which time he told a coworker to come get him if a call came in. Later that day, Captain Pat Stefan awakened Alamo by pushing and shaking him, and shouting "Motherfucker get up. You missed the run. You motherfucker. You lazy motherfucker. You piece of shit." Alamo testified that during this altercation, Captain Stefan told him he did not like "his kind." He also testified that "I believe Captain Stefan called me a spic." During this incident, Captain Stefan chest bumped Alamo resulting in a contusion. After this incident, Alamo called the police department and filed a report. Two days after the incident with Captain Stefan, Alamo went on a medical "lay-up" for what Alamo described as chest pains, stress, and anxiety. Alamo testified that while he was on lay-up, other firefighters harassed him at his home during "wellness checks."

In March 2012, Alamo submitted authorizations to return to work signed by his treating physicians. Thereafter, the CFD requested more medical documentation and that Alamo undergo psychological testing, which took place in May 2012. After Alamo was cleared to go back to work in February 2013, he was assigned to Engine 81, which significantly increased the time it took him to commute to work. Alamo avers that Lieutenant Michael Daniels told him that he had been moved to Engine 81 because he behaved badly. Alamo further contends that after he returned to work in February 2013, he was written up for many infractions despite not having any serious issues between 2006 and 2011.

In 2015, Alamo was transferred to Third District, Rescue 1 Tower Ladder 63, where his supervisors warned him that they had "heard about his reputation." During his time at Tower Ladder 63, Alamo requested to become certified for the Office of Fire Investigations, but had to use vacation time to attend the course.

In 2016, Alamo was under considerable stress and a superior officer advised him to go on another medical lay-up. In early 2017, the CFD's medical director Dr. William Wong requested that Alamo undergo a fitness for duty evaluation based on Alamo's medical lay-ups for stress, his erratic behavior observed by medical staff and other CFD employees, and his disciplinary record. In February 2017, the CFD's medical department concluded that Alamo was not fit to return for duty. In July 2017, the CFD sent Alamo a letter stating that he needed to either resign or go on an unpaid medical leave of absence because he was not fit to return to duty and had exhausted all of his paid medical leave allowed under the relevant collective bargaining agreement ("CBA"). Alamo did not choose either of these options, but expressed his desire to go back to work. On August 9, 2017, the CFD terminated Alamo's employment.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986). When determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255; *Hackett v. City of South Bend*, 956 F.3d 504, 507 (7th Cir. 2020). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific

3

facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020).

**Discussion**

*Race and National Origin Discrimination*

Alamo brings his race and national origin discrimination claims under both 42 U.S.C. § 1981 and Title VII, which the Court reviews under the same legal standard. *Morris v. BNSF Railway Co.*, 969 F.3d 753, 758 (7th Cir. 2020). In determining whether employment discrimination claims can go forward to trial, the Court's focus is on "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). To establish a race or national origin discrimination claim, a plaintiff may proceed by introducing direct or circumstantial evidence that his employer took an adverse action against him based on his national origin or race. *Id.* at 760. In the alternative, a plaintiff may present evidence through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Tyburski v. City of Chicago,* 964 F.3d 590, 598 (7th Cir. 2020). Either way, "at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of*" his protected class. *Carson v. Lake Cty., Ind.,* 865 F.3d 526, 533 (7th Cir. 2017) (emphasis in original).

Alamo proceeds under the *McDonnell Douglas* burden shifting method of proof, which requires him to set forth evidence creating a triable issue of fact that: (1) he belongs to a protected class; (2) he met the City's legitimate job expectations; (3) he suffered an adverse employment action; and (4) the CFD treated similarly situated employees, who were not in his protected class, more

4

favorably. *Marshall v. IDOC*, 973 F.3d 789, 791–92 (7th Cir. 2020). Once Alamo sets forth a prima facie case of discrimination, the CFD must present evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Kellogg v. Ball State Univ.,* 984 F.3d 525, 528 (7th Cir. 2021). If the CFD makes this showing, "the burden shifts back to the plaintiff to call the explanation into question as pretextual." *Id.*

The CFD first contends that Alamo cannot proceed with his race discrimination claim brought under 42 U.S.C. § 1981 because he cannot show that the City's actions interfered with his ability to make, enter, or enforce his contract of employment with the City. *See Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006). Specifically, the CFD argues Alamo cannot bring his § 1981 claim because the contract at issue was the CBA between his union and the City, and not Alamo and the City. The City's argument is unavailing because a "contractual relationship" also exists between Alamo and the CFD as employer and employee. *Davis v. Time Warner Cable*, 651 F.3d 664, 671 (7th Cir. 2011) ("Section 1981 prohibits racial discrimination and retaliation against employees when a contractual relationship exists between the employer and employee."). To conclude otherwise would mean that union members, who are the intended beneficiaries of CBAs, could never sue their employers for race discrimination under § 1981.

Moving to Alamo's race and national origin discrimination claims, Alamo has failed to present evidence creating a genuine issue of material fact for trial that he was meeting the CFD's legitimate job expectations, and thus he has not establish prima facie case of national origin or race discrimination. Here, the CFD explains that Alamo was not meeting its legitimate job expectations based on a report performed in February 2017 by an independent neuropsychologist, Dr. Lisa Rone, who concluded that Alamo was not fit to return to work as a firefighter. Dr. Rone based her decision on Alamo's personnel and disciplinary record, his personal physicians' notes, and psychological and medical testing, including an EEG and MRI.

5

Alamo does not point to evidence contradicting Dr. Rone's conclusion, but rather contends that three separate physicians had found him fit for duty in 2012, and another physician found him fit for duty over a year after his discharge in 2018. As for the three physicians Alamo identifies, Drs. Daniel Martinez, Thomas Brennan, and Dr. Carlos Reynes, they concluded that Alamo was able to return to duty approximately five years before his discharge. In particular, Dr. Martinez's letter stating Alamo could return to work is dated March 14, 2012 and Dr. Brennan's report is dated March 24, 2012. Similarly, Dr. Reynes stated Alamo could return to work on March 14, 2012. As to Dr. Elizabeth Thompson's report, she evaluated Alamo in October 2018. These medical opinions are not relevant because they do not demonstrate that Alamo was fit for duty at the time of his discharge in August 2017. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002) ("the question is whether he was meeting his employer's expectations at the time he was terminated."). Simply put, the question is not whether Alamo was ever fit for duty, but whether he was fit to return to duty at the time the CFD terminated his employment. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014).

Although Alamo did not establish a prima facie case of race or national origin discrimination, the Court turns to the pretext inquiry for the sake of completeness. The CFD explains that the reason it terminated Alamo's employment is after he ran out of paid medical leave in the summer of 2017, he had the choice to take unpaid medical leave or resign because had not been cleared for duty. He declined to make a decision, after which the CFD terminated his employment.

Pretext is more than faulty reasoning or bad judgment – it is a lie or a phony reason. *Barnes v. Board of Trs. of Univ. Ill.*, 946 F.3d 384, 389 (7th Cir. 2020). To establish pretext, Alamo must identify "weaknesses, implausibilities, inconsistencies, or contradictions" in the CFD's proffered reason that a reasonable person would find unworthy of credence. *de Lima Silva v. Department of*

6

*Corr.,* 917 F.3d 546, 561 (7th Cir. 2019) (citation omitted). In this context, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Robertson v. Department of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020) (citations omitted).

Alamo seeks to establish pretext three separate ways. First, he argues that he can establish pretext because the CFD treated similarly situated employees more favorably in the manner which they returned to work from a medical lay-up. In other words, Alamo asserts that the CFD selectively enforced the return to work policy against him one way, but non-Latino individuals another way. *See Coleman v. Donahoe,* 667 F.3d 835, 858 (7th Cir. 2012). Although similarly situated employees need not be identical, they must be directly comparable to the plaintiff in all material respects. *McDaniel v. Progress Rail Locomotive, Inc.,* 940 F.3d 360, 368–69 (7th Cir. 2019). This means Alamo must show the comparators and he had the same decisionmaker, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances that would distinguish the decisionmaker's treatment of them. *See id*; *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 629 (7th Cir. 2018).

In support of his argument, Alamo contends that the record shows twenty-five non-Latino members of the CFD had gone on medical lay-ups for stress, but that none were required to submit additional documentation or undergo fitness for duty evaluations like he did. In making this argument, Alamo points to a list of firefighters who went on medical lay-up that gives reasons why the individual was on lay-up, the treatment they received, and whether more documentation was necessary. (R. 225-13, Defs.' Ex. 17, DEF002896). The list, however, provides no details as to whether there were circumstances that would distinguish each individual's treatment, except for the fact that Alamo's mental health diagnosis, which included Post-Traumatic Stress Disorder ("PTSD") and Traumatic Brain Injury ("TBI"), among other factors, was significantly different than the non-

7

Latino firefighters. This bare-boned list, which contains only partial information as to each individual, is insufficient to raise a triable issue of fact that the CFD treated comparable individuals better than Alamo because it lacks sufficient detail for the Court to make a meaningful comparison of the individuals listed.

Second, Alamo asserts that he can establish pretext because Dr. Rone's fitness for duty evaluation was not the motivation for the CFD to terminate his employment. Alamo bases this argument on his physicians and Dr. Thompson, who concluded that he was fit to return to duty. As discussed, these physicians found Alamo was fit for duty either five years before or one year after his discharge. That the CFD relied on the most current fitness examination by Dr. Rone does not raise a reasonable inference that the reason for discharging Alamo was a lie or phony reason. *See Khungar v. Access Cmty. Health Network,* 985 F.3d 564, 573 (7th Cir. 2021) ("[S]peculation is not sufficient to survive summary judgment," instead "there must be evidence.") (citation omitted). Moreover, Alamo relies on the fact that he requested a second opinion after Dr. Rone's conclusion to show pretext, but that alleged request is not supported by the record.

Last, Alamo argues he can establish pretext based on the CFD's shifting explanation for terminating his employment. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 638 (7th Cir. 2018). Alamo bases his argument on the CFD's second reason for his termination, namely, that Alamo falsified his application to work for the CFD. That the CFD gave two reasons for Alamo's termination does not establish that the reasons were pretext for discrimination, especially because the CFD never strayed from its explanation that Alamo was not fit for duty and had exhausted all of his paid medical leave in the summer of 2017. *See McCann v. Badger Mining Corp.,* 965 F.3d 578, 590 (7th Cir. 2020) ("the explanations must actually be shifting and inconsistent to permit an inference of mendacity.") (citation omitted).

Viewing the facts and all reasonable inferences in Alamo's favor, he has failed to present sufficient evidence creating a genuine issue of material fact for trial that he met the CFD's legitimate job expectations and that the CFD's reason for his termination was pretext for race or national origin discrimination. The Court therefore grants this aspect of defendants' summary judgment motion.

*Retaliation*

Alamo also brings a retaliation claim under the IHRA, § 1981, and Title VII, which the Court reviews under the same standard. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). To establish his retaliation claim, Alamo must show: (1) he engaged in a statutorily protected activity; (2) the CFD took a materially adverse action against him; and (3) there is a but-for causal connection between the two. *Khungar,* 985 F.3d at 578; *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020).

Alamo provides two types of statutorily protected activity under the first element of his retaliation claim, namely, when he called the police regarding the September 2011 incident with Captain Stefan and his April 2012 EEOC Charge alleging national origin discrimination, disability discrimination, and retaliation. *See Alamo v. Bliss*, 864 F.3d 541, 555 (7th Cir. 2017) ("Alamo's ability to report what he viewed as workplace discrimination clearly is protected activity under Title VII."); *Greengrass v. International Monetary Sys., Ltd.,* 776 F.3d 481, 485 (7th Cir. 2015) (EEOC charges are the "most obvious form of statutorily protected activity.") (citation omitted). Second, as Alamo correctly asserts, the definition of an adverse action in the context of a retaliation claim is broader than in intentional discrimination claims. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Here, Alamo maintains that the CFD's adverse actions include the retaliatory hurdles that he had to submit three treating physician medical releases in March 2012 and undergo a fitness for duty evaluation during that time period. He also argues

9

that being assigned to Engine 81 in February 2013, which significantly increased the distance to work, was another retaliatory hurdle.

To establish a causal connection between the statutorily protected activities of the 2011 police report and 2012 EEOC Charge and the retaliatory conduct, Alamo must set forth "evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Robertson*, 949 F.3d at 379. As a threshold matter, however, Alamo must show that the decisionmaker who retaliated against him knew of the protected activity in the first instance. *Khungar*, 985 F.3d at 578; *Tyburski*, 964 F.3d at 603.

Turning to who made the decisions involved in the alleged retaliatory actions, the decisionmaker who requested that Alamo submit to a fitness of duty evaluation in 2012 was Dr. Hugh Russell, the CFD Medical Director from November 1988 until November 2012.[1] Alamo does not explain how Dr. Russell knew of his 2012 EEOC Charge or his police report about Captain Stefan's 2011 conduct nor does he point to evidence in the record that would show this knowledge. Similarly, Alamo does present evidence as to who requested him to submit three treating physician medical releases in March 2012, but merely states the medical department told him as such. At his deposition, Alamo stated "they" asked him to have his doctors sign a release that he could return to work. After reviewing the record, the Court could not locate who "they" were.

Further, Alamo does not identify who assigned him to Engine 81 when he returned to work in February 2013, although he averred that Lieutenant Daniels told him he had been assigned to Engine 81 for his bad behavior. The evidence in the record is clear, however, that Lieutenant

---

[1] Although Alamo's asserts that a district chief threatened him with a fitness for duty evaluation if he pressed charges against Captain Stefan after the September 2011 incident, Alamo does not cite to the record to support this allegation. And, after searching the record, the Court could not find any evidentiary support for this assertion.

Daniels did not make the decision to assign Alamo to Engine 81. Alamo's averment alone, without identifying who assigned him to Engine 81, does not raise a reasonable inference that this unnamed decisionmaker knew of Alamo's 2012 EEOC Charge or 2011 police report about Captain Stefan. *King v. Hendricks County Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020) (reasonable inferences must be supported by more than speculation or conjecture).

In the end, Alamo must present some details as to who made the retaliatory decisions and if they knew about his protected activities in order to raise a triable issue of fact that the CFD retaliated against him based on his protected conduct. Without more details as to who the relevant decisionmakers were and whether they knew of his protected activities, Alamo falls short of this task. The Court grants defendants' motion as to Alamo's retaliation claims.

*Hostile Work Environment*

Next, Alamo brings a hostile work environment claim against the CFD.[2] To survive a summary judgment motion on a hostile work environment claim, Alamo must present evidence demonstrating a triable issue of fact that: (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) a basis for employer liability. *Tyburski*, 964 F.3d at 601; *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627 (7th Cir. 2019). Courts consider hostile work environment claims under a totality of the circumstances approach. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018).

---

[2] Although Alamo also brought his hostile work environment claim against defendant Charlie Bliss pursuant to 42 U.S.C. § 1983, Alamo failed to address defendants' argument that Bliss was not liable under § 1983 because he was not acting under the color of state law. Alamo's failure to respond results in waiver of this claim. *See Ennin v. CNH Indus. Am., LLC,* 878 F.3d 590, 595 (7th Cir. 2017).

11

The CFD first argues that Alamo has failed to present evidence raising a triable issue of fact that the harassment he experienced was severe or pervasive. The Court disagrees. When determining if conduct is severe or pervasive, courts look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

Construing the facts and all reasonable inferences in Alamo's favor, he has presented evidence that when he worked at Engine 55 from mid-October 2009 until March 2012, a co-worker called him racially-charged names like "fucking Puerto Rican" and "spic" on an almost daily basis, which qualifies as severe and pervasive harassment. *See Alamo*, 864 F.3d at 550 ("both slurs are severe: each evinces a clear animus against a particular national origin."). Further, Alamo points to other harassment during this time period, including that his co-workers tampered with his personal property, threw away his food, and harassed him at home while he was on medical lay-up. In addition, Alamo has set forth evidence of physically threatening and severe behavior based on the September 2011 incident with Captain Stefan, who pushed Alamo and chest bumped him calling him a "spic" and that he did not like Alamo's "kind." *See Clay v. Interstate Nat'l Corp.*, 900 F.Supp. 981, 990–91 (N.D. Ill. 1995) (Castillo, J.) ("expressions such as 'you people' and 'your kind' are sometimes used to refer to a race as a group."). The record also shows that the culmination of this harassment unreasonably interfered with Alamo's work performance because shortly after his interaction with Capitan Stefan and on the heels of the co-worker harassment, Alamo went on a voluntary medical lay-up for what he described and chest pains, stress, and anxiety. Looking at the totality of the evidence, it is "significant that the harassment occurred in an atmosphere where firefighters live and serve together and in which mutual interdependence is an essential factor in effectiveness and, at times, survival." *Alamo,* 864 F.3d at 551.

Because Alamo has presented evidence creating a triable issue of fact as to the severe and pervasive nature of the harassment, the Court examines the CFD's argument concerning employer liability. "Employers are strictly liable for the discriminatory acts perpetrated by supervisors and they are liable for the discriminatory acts of others—coworkers, independent contractors, customers, inmates etc.—only if they are negligent either in discovering or remedying the harassment." *Johnson v. Advocate Health & Hosp. Corp.*, 892 F.3d 887, 904 (7th Cir. 2018). Under Title VII, to be considered a supervisor, the individual must have had "the power to directly affect the terms and conditions of the plaintiff's employment," including "the authority to hire, fire, promote, demote, discipline or transfer plaintiff." *Nischan v. Stratosphere Quality, LLC,* 865 F.3d 922, 930 (7th Cir. 2017). Alamo does not address whether Captain Stefan was a supervisor under Title VII, therefore, he has the burden of showing that the CFD knew of the national origin and racial harassment and did did not act reasonably to remedy the issue as to both Captain Stefan and his co-workers. *Johnson*, 892 F.3d at 904.

The CFD argues that because Alamo did not file racial and national origin harassment complaints through "well-established mechanisms for reporting complaints of discrimination," it cannot be held liable for failing to take corrective measures. Alamo, on the other hand, has presented evidence that he complained to his supervisors of the harassment. For example, on a form in evidence dated January 2, 2012, Alamo explains why he believes he was subjected to a hostile work environment based on the September 2011 events with Captain Stefan and that he had also submitted a Form 2 to the Internal Affairs Division ("IAD"). Alamo also filed a Form 2 to the IAD dated February 22, 2013 explaining that Captain Stefan stated he didn't like Alamo's "kind." Other evidence of notice includes Lieutenant Bliss' testimony that after Alamo informed him of the incident with Captain Stefan, Bliss called Chief Steven Chikerotis to review the incident. Further, Alamo testified at his deposition that he turned in numerous Form 2s to his chain of command

about the harassment and that he reported the racial slurs and that other firefighters were throwing away his food to his supervisor Lieutenant Bliss.

Despite the CFD's argument to the contrary, this evidence creates a triable issue of fact that demonstrates Alamo complained about the harassment to his supervisors and through the CFD's procedures. In the end, Alamo has present sufficient evidence that the CFD was negligent in discovering and remedying the racial and national origin harassment. *See Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 856 (7th Cir. 2019). The Court therefore denies defendants' summary judgment motion as to Alamo's hostile work environment claim.

*Disability Discrimination*

Last, Alamo asserts that he experienced disability discrimination under the ADA and the IHRA based on a perceived disability related to his PTSD and TBI. The Court first notes that IHRA claims are analyzed under the same framework as an ADA disability discrimination claims. *Teruggi v. CIT Group/Capital Fin., Inc.,* 709 F.3d 654, 659 (7th Cir. 2013). To establish an ADA/IHRA discrimination claim, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he was qualified to perform the essential functions of the relevant job with or without reasonable accommodation; and (3) he suffered an adverse employment decision because of his disability. *Sandefur v. Dart*, 979 F.3d 1145, 1151 (7th Cir. 2020). To succeed on an ADA claim of "perceived impairment," Alamo must present evidence that the CFD took an adverse action against him based on its belief that his condition was an impairment as defined by the ADA. *Richardson v. CTA*, 926 F.3d 881, 892 (7th Cir. 2019).

The Court turns to whether Alamo suffered an adverse employment decision based on the perceived disabilities because it is dispositive. As discussed, in early 2017, the CFD's medical director Dr. Wong requested that Alamo undergo a fitness for duty evaluation based on Alamo's medical lay-ups for stress, erratic behavior, and disciplinary record. In February 2017, Dr. Rone

concluded that Alamo was not fit for duty after conducting a psychological fitness evaluation. The CFD's request that Alamo, as a firefighter, submit to a fitness for duty evaluations was job-related and consistent with the CFD's Medical Procedure General Order. Indeed, it is not uncommon for public safety agencies to require psychological evaluations of their employees and courts have found such evaluations acceptable when used to determine an employee's ability to perform his work safely. *See Freelain v. Village of Oak Park*, 888 F.3d 895, 903 (7th Cir. 2018). As such, there was nothing sinister about requesting Alamo to undergo a fitness for duty evaluation as Alamo suggests.

The CFD's decision to discharge Alamo was not pretext for discrimination because when Alamo exhausted his paid medical leave as provide by the CBA and had yet to be cleared to return to work, the CFD gave him the choice of resigning or taking unpaid medical leave. When Alamo failed to respond to these options, the CFD terminated his employment. Thus, the CFD's decision was not based on a perceived disability, but on Alamo running out of paid medical leave and his decision not to take unpaid medical leave. In sum, construing the evidence and all reasonable inferences in his favor, Alamo has not presented evidence casting doubt on the CFD's reason for his termination. Accordingly, the Court grants defendants' summary judgment motion as to Alamo's disability claim brought under the ADA and the IHRA.

**Conclusion**

Based on the foregoing, the Court grants in part and denies in part defendants' summary judgment motion [223]. The remaining claim in this lawsuit is plaintiff's hostile work environment claim. The Court dismisses Charlie Bliss as a named defendant from this lawsuit.

IT IS SO ORDERED.

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge

DATED: 2/18/2021